UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

DONNA E. FISHLEY )
)
V. ) NO. 2:14-CV-254
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. The Plaintiff's claim for Supplemental Security Income under the Social Security Act was denied by the Defendant Commissioner following a hearing before an Administrative Law Judge. This is an action for judicial review of that adverse decision. The Plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 19], and the Defendant Commissioner has filed a Motion for Summary Judgment [Doc. 21].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor

resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

The Plaintiff was a younger individual under the applicable regulations at the time she applied for benefits. She has a high school education. There is no dispute that she cannot return to her past relevant work.

Plaintiff's medical history is set forth in the Defendant's brief as follows:

> Plaintiff submitted medical records dating as early as 2003 – eight years prior to her alleged onset date – in support of her disability claim. Records from October 2003 reflect that Plaintiff struggled with anxiety and depression and had difficulty holding a job (Tr. 230-31). In April 2004, Plaintiff went sought counseling after discovering that her current husband was abusing her children (Tr. 225). She reported that she had tried a variety of medications for her anxiety and depression, and requested Klonopin because it was "the only thing that works," but the doctor refused to prescribe the medication because of the highly addictive nature of the drug (Tr. 226).
> 
> Six years prior to her alleged onset date, Plaintiff was admitted to Indian Path Pavilion for five days in January 2005 (Tr. 239). She had stabbed herself with a knife three or four months earlier, and had cut herself again two days prior to admission (Tr. 239). She was having difficulty dealing with her husband's abuse of her children, and was planning to self-mutilate again (Tr. 239). During her stay, the doctors observed that Plaintiff was hyperverbal, lied to other patients, and was deliberately hurting herself to obtain narcotics, and was drug-seeking pain medications (Tr. 240). The doctors indicated that Plaintiff's counselor would need to be advised of her drug-seeking behavior and that she needed to be tapered off Klonopin (Tr. 240).
> 
> In March 2005, she returned to treatment having stabbed herself 10 days

2

prior to admission (Tr. 262-66). She stated it was an attention attempt because she had "graduated" from group, and requested that she be reassigned to her counselor (Tr. 262). The doctor noted that Plaintiff needed to be tapered off of Klonopin (Tr. 264). She reported a history of physical, sexual, and mental abuse as a child (Tr. 265). She smelled of alcohol (Tr. 265). She had a healing abdominal stab wound, but her physical examination was otherwise normal (Tr. 265). Upon mental status examination, Plaintiff was friendly and cooperative and maintained good eye contact (Tr. 266). Her mood was "alright" but her affect was angry (Tr. 266). The doctor noted that Plaintiff was focused on obtaining pain medication (Tr. 266). Her insight and judgment were limited (Tr. 266). Following her discharge, she obtained counseling services and medication management through Holston Counseling (Tr. 405-41).

Records from 2005 indicate that Plaintiff sought pain management for back pain and migraine headaches (Tr. 331-442). A January 2009 computed tomography (CT) scan of Plaintiff's brain was normal (Tr. 796). In February 2009, a magnetic resonance imaging (MRI) scan of the lumbar spine showed minimal disc bulging L3-L4 through L5-S1 with no stenosis or nerve root compression, minimal protrusion at L1-L2, and mild right L5-S1 facet osteoarthritis (Tr. 368). In December 2010, MRI lumbar spine revealed mild changes with small disc bulges at multiple levels and tiny central disc protrusion at L3-4 causing mild impression on thecal sac but no spinal canal stenosis or nerve root displacement, and mild facet hypertrophy (Tr. 460-61).

In December 2010, one month prior to her alleged onset date, Plaintiff told Lisa Blevins, a nurse practitioner, that she was "doing okay I guess" (Tr. 405). Working with her therapist was helpful and she reported being "able to talk about some of my deep, dark secrets" (Tr. 405). She reported eating and resting well (Tr. 405). She felt her current combination of medications were helpful and wanted to continue them (Tr. 405). Upon mental status examination, Plaintiff was alert, oriented, calm, and cooperative (Tr. 405). She made good eye contact, established rapport, and had no abnormal mannerisms (Tr. 405). She provided logical answers to questions and participated well in treatment discussions and decisions (Tr. 405). Her speech was rambling at times but not pressured and she was easily redirectable (Tr. 405). Her psychomotor activity was normal (Tr. 405). Her mood was "okay" and her affect was bright (Tr. 405).

In February 2011, Plaintiff told the emergency room doctors "I need pain medication" (Tr. 445). The doctor noted Plaintiff had previously visited the emergency room with reports of needing pain medication (Tr. 445-46). She was not observed to be in any distress (Tr. 446).

In March 2011, Plaintiff told Ms. Blevins that she was "not doing so well" (Tr. 564). She had been thinking about her children's sexual abuse (Tr. 564). She also felt guilty about her 10 past abortions (Tr. 564). Her mood was reported as "anxious/worried" and she had a nervous affect, but her mental status examination was otherwise normal (Tr. 564). Her medications were not changed (Tr. 565).

In April 2011, Wayne Lanthorn, Ph.D., performed a psychological

3

consultative examination of Plaintiff as part of her disability application process (Tr. 516-19). Following a clinical interview and mental status examination, Dr. Lanthorn assessed a global assessment of functioning (GAF) score of 60 (Tr. 519). He opined that she could understand and remember, was of average intellectual functioning, and could attend and concentrate (Tr. 519). He opined that she should be able to maintain basic routine (Tr. 519). Her social interaction may show a mild limitation due to personality disorder traits (Tr. 519). Her general adaptation skills showed mild-to-moderate limitations (Tr. 519). She could be aware of simple hazards and take precautions (Tr. 519). She could drive and travel alone if she had a car (Tr. 519). She could use public transportation if available (Tr. 519). She should be able to set goals and make plans to achieve these goals independently (Tr. 519). She may have mild difficulty working in proximity to others, moderate difficulty dealing with stress, and mild-to-moderate difficulty adapting to change (Tr. 519). A State agency psychological consultant found Plaintiff's credible limitations resulted in mild limitations in activities of daily living; moderate limitations in social functioning; mild limitations in concentration, persistence, and pace; and no episodes of decompensation (Tr. 533, 535). The psychologist opined that during an eight-hour workday, Plaintiff could understand and remember simple and one- to three-step detailed tasks; could concentrate and persist for at least a two-hour time period with customary breaks; could interact appropriately with the public, co-workers, and supervisors occasionally; and could adapt to infrequent change (Tr. 539).

In April and May 2011, Plaintiff went to the emergency room several times with complaints of headaches (Tr. 577-90). She reported severe pain, but her physical examinations were normal and she was not observed to be in any distress (Tr. 577-90). She was given medication and sent home (Tr. 577-90).

In May 2011, Plaintiff was referred to David Cantor, Psy.D., by a friend (Tr. 547-48). She circled almost all symptoms as "current issues/problems," including "lying" (Tr. 546). Upon mental status examination, Dr. Cantor observed a sad and anxious mood; rambling and tangential speech processes; poor memory, attention, and concentration; ruminative thought processes; lethargic energy level; and no suicidal or homicidal ideation (Tr. 546). Dr. Cantor diagnosed major depression and assessed a global assessment of functioning (GAF) score of 30 (Tr. 548).

That same day, Marianne Filka, M.D., performed a physical consultative examination of Plaintiff (Tr. 541-43). Plaintiff described her back pain as constant, shooting, stabbing, burning, achy, sharp, knife-like stabbing, sticking, pressure, shock-like, throbbing, cramping, pins, needles, and numbness (Tr. 541). Her pain was worse with coughing, sneezing, prolonged sitting, prolonged standing, walking, driving, bending, lifting, prolonged rest, and prolonged activity (Tr. 541). Her other complaints were depression and migraine headaches (Tr. 541). Dr. Filka observed that Plaintiff was a good, cooperative historian with average intellectual functioning, a neat and clean appearance, and a pleasant demeanor (Tr. 542). Upon physical examination, Plaintiff's gait was normal

4

without use of an assistive device (Tr. 542). She had 80 degrees flexion in her low back with normal lateral bending rotation and extension (Tr. 542).

The next week, Plaintiff told Ms. Blevins that she was doing better (Tr. 562-63). The change in medications had improved her moods (Tr. 562-63). She was having less intrusive thoughts and was sleeping well (Tr. 562-63). Upon mental status examination, Plaintiff was alert, oriented, calm, and cooperative (Tr. 562). She made good eye contact, established rapport, and had no abnormal mannerisms (Tr. 562). She provided logical answers to questions and participated well in treatment discussions and decisions (Tr. 562). Her speech was easily understood (Tr. 562). Her psychomotor activity was normal (Tr. 562). Her mood was "better" and her affect was bright and improved (Tr. 562).

That night, Plaintiff went to a different emergency room than the previous one that had denied her medications for her alleged migraines (Tr. 723-24). Her physical examination was normal (Tr. 723). A few days later, she returned to the emergency room (Tr. 725). She denied having been recently seen (Tr. 725). Physical examination was normal (Tr. 726).

In May 2011, a State agency medical consultant opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently and sit, stand, and walk for about 6 hours during an 8-hour workday (Tr. 550). She could occasionally climb ladders, ropes, and scaffolds, and could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs (Tr. 551). She had no other limitations (Tr. 552-53).

Emergency room records from June 2011 noted that Plaintiff repeatedly requested Dilaudid and other opioids for headache complaints and then requested another doctor (Tr. 574- 76). However, she was prescribed Fioricet and discharged in stable condition (Tr. 574-76). A June 2011 CT scan of Plaintiff's head revealed no brain abnormalities (Tr. 733).

In October 2011, Dr. Lanthorn performed a second psychological consultative examination of Plaintiff (Tr. 742-46). Following a review of Plaintiff's available medical records, a psychological evaluation with a clinical interview, and a mental status examination, Dr. Lanthorn found that with respect to learning simple and moderately complicated tasks, Plaintiff would have no difficulties, but may well have moderate limitations performing moderately complicated tasks on a routine basis (Tr. 746). She would have mild or greater limitations interacting with others in the workplace (Tr. 746). She would have mild or greater limitations sustaining concentration and effectively persisting at tasks (Tr. 746). She would have mild limitations dealing with changes and requirements at the workplace (Tr. 746).

In September 2012, Plaintiff told Ms. Blevins that she was having an "awful" time (Tr. 779). She reported persistent anxiety, panic symptoms, problems with agoraphobia, and feeling sad and down on a regular basis (Tr. 779). Upon mental status examination, Plaintiff was alert, oriented, calm, and cooperative (Tr. 779). There were no abnormal mannerisms and her speech was easily understood (Tr. 779).

5

The next week, Plaintiff told Gordon Bontrager, M.D., that she had experienced migraine headaches two to three times each week for the past seven years (Tr. 858). She had been offered Depakote but refused to take it due to possible weight gain (Tr. 858). She told Dr. Bontrager that narcotics allowed her to "sleep it off" (Tr. 858). She stated that Topamax provided 20 percent relief (Tr. 858). The migraines were associated with vision loss in her right eye and numbness and tingling in her right arm (Tr. 858). Upon physical examination, Plaintiff had normal range of motion, muscle strength, and stability in all extremities with no pain on inspection (Tr. 859). Upon mental status examination, Plaintiff was agitated and exhibited signs of exaggerated behavior and grandiosity (Tr. 859). Dr. Bontrager noted that he had never seen Plaintiff while she was "actually having a migraine" and that he deferred to neurologists to determine the severity of her condition (Tr. 860). He refilled her Topamax but stated that he suspected that many of Plaintiff's symptoms were linked to psychological disorder more than physical disease (Tr. 860). He reiterated that he strongly suspected Plaintiff of malingering and possible conversion disorder or at least hedonistic attention seeking behavior (Tr. 860).

The next month, in October 2012, Dr. Cantor provided a summary of Plaintiff's therapy to her attorney (Tr. 803). He noted that she had been seen 27 times in individual psychotherapy and twice in group psychotherapy since her initial visit in May 2011 (Tr. 803). He stated her attendance in psychotherapy had been inconsistent due to her difficulties with depression, her poor memory, and her inability to function responsibly (Tr. 803). He stated that she was not able to continue in group psychotherapy due to her inability to communicate and interact well with others (Tr. 803). He opined that Plaintiff functioned at a low level adaptively, emotionally, and interpersonally, and that her function had not significantly improved since he had started treating her (Tr. 803). As an example, he stated that she and her son lived with her daughter because of her inability to maintain her own separate residence (Tr. 803). He stated she had marked impairment in several areas, including great difficulty in modulating her emotional functioning, entering into very problematic interpersonal relationships, severe difficulty setting boundaries, understanding the work around her – often relying on fantasy rather than reality, trouble communicating her thoughts and feelings about the issues in her life, and an inability to gain or maintain any kind of employment (Tr. 803). He completed a mental RFC form and indicated she was markedly limited in 18 of 20 areas related to understanding and memory, sustained concentration and persistence, social interaction, and adaptation (Tr. 805-06).

The next week, Plaintiff told Dr. Bontrager that she was experiencing pain in her low back and buttocks area following a fall from a chair at Burger King (Tr. 855). She also reported that she had a headache that was aggravated by bright lights (Tr. 855). Upon physical examination, Plaintiff ambulated without difficulty and had full range of motion in all joints (Tr. 856). The doctor observed that Plaintiff was in no distress due to her musculoskeletal injury (Tr. 856). He

6

observed that Plaintiff exhibited pressured speech, non-tangential thought patterns, and grandiosity (Tr. 857). The doctor denied Plaintiff's request for a muscle relaxer because he found it hard to believe that a fall from a seated position to the floor would cause significant damage (Tr. 857). He also declined medications for Plaintiff's reported migraine headaches because he did not see any signs of headaches (Tr. 857). He assessed instead that Plaintiff exhibited classic signs of borderline personality disorder rather than physical disease (Tr. 857).

[Doc. 22, pgs. 3-10].

At the supplemental administrative hearing on February 28, 2013, the ALJ took the testimony of A. Bentley Hankins, a vocational expert ["VE"]. First, he asked Mr. Hankins if there would be jobs which a person could perform with the marked levels of restriction opined by Dr. Cantor. He replied that there would be no jobs. He then asked the VE if there would be jobs which a person could perform if they were of Plaintiff's age, educational background, and work history, and if they were limited to medium work, with moderate difficulties in social functioning, and "mildly moderate" in regards to her restrictions of daily living, and in "maintaining concentration and persistence of pace." Mr. Hankins identified over five million jobs in the national economy and over one hundred thousand jobs in Tennessee which such a person could perform. (Tr. 27-28).

On March 18, 2013, the ALJ rendered his hearing decision. He found that the Plaintiff has severe impairments of a back disorder, obesity, migraine headaches, depressive disorder, anxiety related disorder, and a personality disorder. He found that she had no impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 11).

In making his finding regarding the listings of impairments, the ALJ considered

7

her mental impairments. To meet the mental listings he considered, he had to determine whether the "paragraph B" criteria were satisfied. That paragraph requires a marked restriction in two of the following three categories of functioning: activities of daily living; maintaining social functioning; and maintaining concentration, persistence or pace. Another category, episodes of decompensation of extended duration, is not present in this case. The ALJ found that the Plaintiff had mild limitations in activities of daily living, moderate limitations in social functioning, and mild limitations in concentration, persistence or pace. (Tr. 11-12).

The ALJ then found that the Plaintiff had the residual functional capacity ["RFC"] "to perform medium work…that can be performed with moderate difficulties in maintaining social functioning, mild difficulties in activities of daily living, and mild difficulties in maintaining concentration, persistence, and pace." (Tr. 12). The ALJ then proceeded to the two-step process used in considering Plaintiff's symptoms. First, he stated he must decide if she has "an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms." The second step is to determine the "extent to which they limit the claimant's functioning." In that regard, he must evaluate the Plaintiff's credibility regarding the alleged limiting effects of her impairments. (Tr. 12-13).

He then summarized Plaintiff's complaints as being unable to work due to back

pain which affects her ability to walk or sit or stand; frequent migraines with blurred vision and eye pain; and depression and panic attacks severely compromising her ability to maintain a routine or to handle the public or go out in public. He then discussed the medical evidence in the record which he considered in making this determination. He noted that her back and hip pain and migraine headaches had been treated with medication. He noted that the Plaintiff often sought narcotic pain relievers, which doctors at times refused to give her. He noted that on June 18, 2011, visit to an emergency room she requested another doctor when the first one would not prescribe "Dilaudid and other opioids" for her headache pain. Her physical examinations on these various visits were basically normal. One of her treating doctors, Dr. Gordon Bontrager, noted that he had never seen the Plaintiff while she was actually having a migraine. The ALJ stated that Dr. Bontager once saw Plaintiff when she claimed to have injured herself falling from a seated position in a chair to the floor. He refused her request for muscle relaxers and said "he found it hard to believe that a fall from a seated position to the floor could cause significant damage, and noted he had not seen signs of migraine." The ALJ stated that Dr. Bontager said Plaintiff "exhibited classic signs of borderline personality rather than physical disease." (Tr. 13-14).

He then discussed the finding of Dr. Filka, whose exam revealed a full range of motion in the neck, normal lateral bending and rotation of the back and flexion of the back to 80 degrees. Dr. Filka also noted that the Plaintiff weighed 222.5 pounds at a height of 68.5 inches, with a normal gait. (Tr. 14).

The ALJ then turned to the Plaintiff's history regarding her mental impairments. He noted her prior hospitalizations for mental problems. He stated that in March of 2011 she had complaints of increased symptoms but said they "improved with medication adjustment."

He then discussed Dr. Lanthorn's first mental consultative examination in April of 2011. The ALJ stated that other than being slightly anxious and slightly depressed, Dr. Lanthorn mentioned little in the way of abnormalities. He assessed her Global Assessment of Functioning at 60. Dr. Lanthorn opined mostly mild limitations except for mild to moderate limitations in general adaptation skills and adapting to change, and moderate difficulty dealing with stress.

The ALJ mentioned that when she began treatment one month later with Dr. Cantor, her treating psychologist, she had "67 of 84 listed symptoms, one of which was 'lying.'" Dr. Cantor opined that her GAF that day was 30. (Tr. 14). She was seen one week later by a psychiatrist at Frontier Health and the ALJ stated that Plaintiff "reported doing better...with improved moods, less intrusive thoughts, and less anxiety." The ALJ noted that the record of that visit showed that the Plaintiff's affect was "bright." (Tr. 14-15).

On October 27, 2011, the Plaintiff had a second examination by Dr. Lanthorn. The ALJ summarized Dr. Lanthorn's findings after this exam as indicating the Plaintiff "would have no difficulty learning simple and moderately complicated tasks but may have moderate limitations performing moderately complicated [sic] on a routine basis;

10

mild or greater limitations in interacting with others in the workplace; mild or greater limitations sustaining concentration and persisting at task; and mild limitations in dealing with changes and requirements at the workplace."

Next, the ALJ stated that in May of 2012, records from Frontier Health showed the Plaintiff's moods were fairly stable, with a bright affect and no abnormalities on her mental status exam.

The ALJ said that on October 11, 2012, Dr. Cantor indicated the Plaintiff had marked impairment in most areas of mental functioning other than moderate limitations in understanding very short and simple instructions, travelling in unfamiliar places and using public transportation.

The ALJ then stated that evidence of record indicated that the Plaintiff was only limited to the extent of his RFC finding by her physical and mental impairments. He also found that the Plaintiff was not entirely credible in her subjective complaints. (Tr. 15).

He explained the basis for his credibility determination by mentioning that testing showed no "brain abnormalities," and that physical and neurological exams were normal. He stated that "her back pain and headaches have been conservatively treated and adequately managed by the same medications over many years without adverse side effects." He pointed out that her complaints had not warranted extensive testing or treatment by orthopedists, neurologists or pain specialists. Her treatment by her family doctor was intermittent and she had received treatment at the emergency room. He discussed her daily activities. He summarized that "such activities, conservative

11

treatment, and clinical and diagnostic findings are not consistent with pain and other symptoms that would preclude all work activity." He then said he considered her history of migraines and back pain in combination with her obesity in finding her capable of medium work and that "the totality of the evidence is not consistent with pain and other symptoms of such severity, frequency or duration that would preclude the standing, walking and sitting required of medium work." (Tr. 16).

The ALJ then said that Plaintiff's mental disorders had been well managed with outpatient treatment and medication. He mentioned references to Plaintiff's "bright affect." He again discussed her daily activities. He said they did not indicate more than moderate limitations in social functioning and were not consistent with more than mild limitations in activities of daily living and maintaining attention and concentration needed in unskilled work. (Tr. 16-17).

The ALJ then explained the weight given to the medical opinions. He gave great weight to the State Agency consultants insofar as they opined a physical capacity for medium work. However, he found that their opinions of Plaintiff having postural limitations were not supported by objective evidence.

He also gave great weight to the "initial" State Agency psychological assessment, which opined, as did he, that the Plaintiff had only mild limitations in activities of daily living and concentration, persistence or pace, and moderate limitations in social functioning. He gave some weight to Dr. Lanthorn's opinions and those of the reviewing State Agency psychologists. However, he did not give weight to their opinions of

moderate limitations in several areas of functioning, saying they appeared to be based upon the Plaintiff's subjective complaints which he rejected for the reasons stated above and because she checked "lying" as a symptom on Dr. Cantor's intake form. Also, he found they were "not consistent with more current treatment records that show the claimant's mental disorders are stable with conservative treatment."

Turning to Dr. Cantor's opinion of marked impairments, he "rejected" them for not being consistent with mental status exams and treatment records from the psychiatrist at Frontier Health. Also, he noted there were no therapy records from Dr. Cantor. Also, Dr. Cantor's assessment of a GAF of 30 on May 13, 2011, was inconsistent with Dr. Lanthorn's assessment one month earlier of a GAF of 60. He also pointed to the Frontier Health psychiatrist saying the Plaintiff had a "bright" affect and improvement in her moods a week later. The ALJ said it was incongruous for Plaintiff to improve from a GAF of 30 which "one would normally expect to require hospitalization or at least a change in medication," to having such improvement within one week. (Tr. 17-18).

He then found, based upon the testimony of the VE, that a significant number of jobs existed which the Plaintiff could perform. Accordingly, he found that she was not disabled. (Tr. 18-19).

Plaintiff asserts that the ALJ erred by failing to properly consider the Plaintiff's reported migraine headaches and evaluate their impact on her ability to work. She also maintains that the ALJ did not give proper weight to Dr. Cantor's opinions, and did not properly evaluate the effects of the Plaintiff's mental impairments on the Plaintiff's

13

residual functional capacity.

With respect to the ALJ's analysis of the Plaintiff's migraine headaches, Plaintiff correctly notes that consideration of this is tied directly to the ALJ's finding that the Plaintiff was not credible. Plaintiff points out that "[a]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. *See Villarreal v. Secretary of Health and Human Services*, 818 F.2d 461, 463 (6th Cir. 1987)." However, as Plaintiff states, the ALJ's assessment of credibility must be supported by substantial evidence. Plaintiff argues that the record does not indicate her migraines ever resolved or were correctly managed by medication.

However, it appears to the Court that the record before the ALJ contained some very damaging evidence tied to both the Plaintiff's complaints of migraines and her credibility. Plaintiff drew the attention of medical personnel when she sought narcotic medication for her migraines on numerous occasions. For example, the ALJ noted that her own treating physician, Dr. Bontrager, was very doubtful about Plaintiff's complaints of frequent, debilitating migraines. On October 18, 2012, Dr. Bontrager declined to prescribe the Plaintiff a muscle relaxer when she allegedly hurt herself falling to the floor from a seat in a chair. He also said, with respect to her complaint of having migraines, that "I am not seeing signs of this. Patient…exhibits classic signs of borderline personality rather than physical disease." (Tr. 857). On October 29, 2012, 11 days later, he said she "has not been seen by me while actually having a migraine…I will refill the

14

Topamax but suspect that many of her symptoms are linked to psychological disorder rather than physical disease." He concluded that report saying "I strongly suspect this patient of malingering and possible conversion type disorder or at the least hedonistic attention seeking behavior." (Tr. 860). Also, as stated by the Commissioner, "Plaintiff would switch emergency rooms or request a different doctor when the doctors refused to prescribe the medication she requested (Tr. 226, 723-24, 860, 876)."

Plaintiff may, indeed, have migraine headaches. She may even have them of the frequency and duration that she described in her testimony. When one's own doctor expresses such profound doubts that one has a particular condition and calls one a malingerer, and when one flits to different emergency rooms, or asks for different doctors than those who refuse narcotic medications, one has created a quagmire of legitimate doubts regarding one's credibility. In any event, the records indicate that the headaches do respond to treatment. There is substantial evidence to support the ALJ's finding on the impact of Plaintiff's migraines, and for his finding her less than credible.

Plaintiff's second basis for seeking review is that the ALJ erred in giving virtually no weight to Dr. Cantor, and in not including all of the effects of her mental impairments in his RFC finding and question to the VE. Dr. Cantor's opinion is contained in a mental residual functional capacity assessment (Tr. 805-807), a one page letter (Tr. 803), and an intake form (Tr. 773-775), the second two pages of which are also found elsewhere (Tr. 546-547). While the Court feels that the ALJ did not err by failing to give Dr. Cantor's assessment controlling weight, there is a significant problem with the mental RFC finding

15

of the ALJ which the Court believes is dispositive of this case.

In his medical source statement which he prepared following his second examination of the Plaintiff in October, 2011, Dr. Lanthorn opined that she had moderate limitations in her ability to interact appropriately with the public, with supervisors and with co-workers, and a moderate limitation in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 748). Soon after this, on November 9, 2011, Dr. Carole Kendall, Ph.D., a State Agency psychologist, completed a psychiatric review technique form which found that the Plaintiff had moderate restrictions in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence or pace. (Tr. 764). Both of these reports were generated after the bulk of the Plaintiff's mental health treatment reports from Frontier Health and Holston Counseling Services for her treatment in 2011 were received.

The ALJ gave no weight to the portions of these assessments which found more than mild limitations in any area except maintaining social functioning. Instead, the ALJ relied entirely upon the opinion of the State Agency psychologist dated April 29, 2011 (Tr 523-536 and 537-540) who did not have the records from Frontier Health and others or the October, 2011 report of Dr. Lanthorn before him. The Court cannot understand why the ALJ gave greater weight to that State Agency psychologist than to the opinions of Dr. Lanthorn and particularly the latest State Agency psychologist who had much more information to base his opinion on than did the "initial" State Agency reviewer. This one opinion, based on limited information, is not supported by substantial evidence,

16

and the reliance upon it was not substantially justified.  The most germane and plausible information supports a finding that the Plaintiff has moderate limitations in her activities of daily living and concentration, persistence and pace as well as in maintaining social functioning.  This is also supported by the opinion of Dr. Bontrager described above who suspected the Plaintiff of having a personality disorder.  Her mannerisms and actions which supported the ALJ's finding regarding her credibility also suggest that her mental impairments in the areas of activities of daily living and concentration, persistence and pace are greater than "mild."

Accordingly, it is respectfully recommended that the matter be remanded to the Commissioner for further consideration of the Plaintiff's mental RFC, and a determination of whether there are a substantial number of jobs she can perform.  It is therefore recommended that the Plaintiff's Motion for Judgment on the Pleadings [Doc. 19] be GRANTED in this respect, and that the Defendant Commissioner's Motion for Summary Judgment [Doc. 21] be DENIED. [1]

                                                    Respectfully submitted,

                                                    s/ Clifton L. Corker
                                                    United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived.  28 U.S.C. 636(b)(1).